UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

**UNITED STATES OF AMERICA** )
)
v. ) Case No. 3:06-00043
) Judge Echols
**JEFFREY STRINGER** )

## MEMORANDUM

Pending before the Court is Defendant Jeffrey Stringer's "Motion to Suppress" (Docket Entry No. 19) to which the Government has responded in opposition (Docket Entry No. 22). The Court held an evidentiary hearing on the Motion on November 7, 2006.

### I. FACTUAL FINDINGS

During the course of the evidentiary hearing, the Court heard from two witnesses, John Hardcastle, a special agent of the Drug Enforcement Administration, and the Defendant. Having heard the testimony of the witnesses and after considering their interests, demeanor and credibility, the Court finds the following to be the relevant facts.[1]

Law enforcement officers learned from a supposedly reliable informant that the Defendant was involved in cultivating and/or selling marijuana at his residence located at 2311 Old Green Briar Road in Greenbrier, Tennessee. Pursuant to that tip, Agent

---

[1] Because these are the Court's findings, any contrary testimony on a specific matter has been rejected in favor of the specific fact found.

1

Hardcastle, along with Deputy Randy Henderson of the Robertson County Sheriff's Department began an investigation.

As a part of the investigation, the two officers began to surveil the property. They drove past Defendant's house when he was not at home and noticed a cannister, about twice the size of an average propane tank, sitting outside one of the two storage sheds behind Defendant's residence. Such canisters commonly contain carbon dioxide.

Upon further investigation, the officers examined Defendant's current electric consumption at his property and compared it with the consumption in past years. They discovered that his electric consumption had recently doubled over previous years. As an experience law enforcement officer specializing in narcotics investigations, Agent Hardcastle testified the facts observed and discovered suggested that Defendant was growing marijuana on his property.

Although the suspicions of the officers were piqued, they were not sure they had probable cause for the issuance of a search warrant. Therefore, the officers decided to visit Defendant at his house and seek permission to search the property.

Shortly after 9:00 a.m. on October 20, 2005, Agent Hardcastle and Deputy Henderson, along with several other agents and officers, went to Defendant's residence. Most of the officers were dressed in plainclothes and their firearms were not visible, but two

uniformed deputies were present to make sure that Defendant knew that the visit to his house was official police business.

Upon pulling onto the property, Agent Hardcastle and Deputy Henderson walked to the back of the residence[2] where Defendant was feeding his cat. Agent Hardcastle introduced himself and Deputy Henderson and told Defendant they had received a reliable tip that he was growing marijuana on the property. In the presence of Deputy Henderson, Agent Hardcastle asked Defendant if they could search his property and Defendant responded in a calm manner stating either "okay" or "all right."[3] Defendant then turned to go into the house, telling Agent Hardcastle they should start in the residence.

As Defendant began to enter the rear of the home, Agent Hardcastle saw several long guns leaning against a wall and, out of concern for safety, asked Defendant not to step into the residence. He also asked if anyone else was in the house and Defendant responded that his friend Daniel Leonard ("Leonard") was inside. Agent Hardcastle told Defendant to have Leonard come outside. When Leonard came out of the house, Agent Hardcastle introduced himself and told Defendant and Leonard to wait on the porch.

---

[2]They walked towards the rear because there were cars parked there and it appeared that the rear door was the main entrance to the house given the worn pathway to it.

[3]Defendant testified that he never consented to a search because he was never asked. Given the Court's findings, this testimony is specifically rejected.

3

While Agent Hardcastle was looking in the house, another officer went to the back of the property and looked in the open door of one of the sheds. In his opinion, the shed had been configured for an indoor grow operation. The other shed was padlocked and you could not see inside.

After Agent Hardcastle came out of the house he went to look at the sheds. The locked shed had a canister on the side with a line running from the cannister into the shed. A water hose attached to a spigot also ran into the shed. The shed was air conditioned but had no windows. In Agent Hardcastle's experience,[4] he believed these factors were indicative of an inside marijuana growing operation.

Agent Hardcastle went back to the rear porch and approached Defendant who was smoking and talking with Leonard. Agent Hardcastle told Defendant that he understood Defendant to be cooperating and that if Defendant was serious about that cooperation he would allow the agents to look inside the shed.

Defendant stared at the shed with a blank look on his face. After being told again that the officers needed to look in the shed, Defendant told Agent Hardcastle that he did not want to open the shed because his puppies were inside. Agent Hardcastle told Defendant the evidence he had seen suggested to him the shed was

---

[4] Agent Hardcastle has been involved in approximately 400-500 narcotic investigations.

4

being used to cultivate marijuana, i.e. it appeared to have carbon dioxide being pumped into it, it had water running into it, and it was air conditioned. Defendant was allowed to talk to his friend Leonard about consenting to the search of the shed and Leonard told him, in Agent Hardcastle's presence, that if it were him (Leonard) he would cooperate. Agent Hardcastle then asked Defendant if he was going to open the shed and Defendant said "yes," but he had to go inside the house to get the key to the shed.

Defendant then went into the house and retrieved the keys off the kitchen counter. Defendant exited the house and walked down to the shed and opened it.

The first couple of feet of the shed contained what appeared to be a processing area. Behind this area were approximately 100 mature marijuana plants and "clones" in pots.

Agent Hardcastle went back to the porch where Defendant had returned and asked him about the plants. Defendant said he did not know how many plants were in the shed, but did tell the Agent he had bought the marijuana seeds from a company in Canada and that he bought the equipment he was utilizing to grow the marijuana from a local establishment. Agent Hardcastle asked Defendant about the funding of the operation and who else was involved. Defendant indicated he did not want to discuss those matters. Agent Hardcastle took that to be an invocation of Defendant's right to remain silent and asked him no further questions.

5

Throughout this time period, Defendant was free to roam about, talk freely with Leonard, and use the phone. In fact, Defendant used his cellphone to call his neighbor who came over during the search and they conversed freely. At some point during the search, members of the local press showed up, although neither Defendant nor Agent Hardcastle made any statements to them.

Local deputy sheriffs from Robertson County charged the Defendant and he was taken into custody at approximately 10:30 a.m. and transported to the Robertson County Jail. Later that day, around 2:25 p.m., Defendant signed a "Waiver of Rights" specifically in relation to his right to remain silent, but he included a hand written note next to his signature stating, "I am not waivering [sic] my rights." Defendant testified he did not read the form before he signed it, but he decided to make the notation about not waiving his rights after seeing the caption "Waiver of Rights."

Later, Defendant was charged in a two-count federal Indictment with manufacturing 100 or more marijuana plants (Count One) and possession with intent to distribute marijuana (Count Two). A Superseding Indictment was returned clarifying that the previously charged offenses occurred within 1,000 feet of an elementary school (Counts One and Two) and adding a charge of possession of a firearm in relation to a drug trafficking crime (Count Three).

6

## II. APPLICATION OF LAW

As a general proposition, the Fourth Amendment prohibits the warrantless search of an individual's property. United States v. Haddox, 239 F.3d 866, 767 (6th Cir. 2001). "This prohibition does not apply, however, to situations in which voluntary consent has been obtained[.]" Illinois v. Rodriquez, 497 U.S. 177, 181 (1990).

The government bears the burden of proving consent and this must be shown "by clear and positive testimony and must be unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion." United States v. Tillman, 963 F.3d 137, 143 (6th Cir. 1992). Factors to be considered in determining voluntariness are the age, intelligence and education of the individual; whether the individual understands his or her right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention, and the use of coercive conduct by the police. United States v. Riascos-Suarez, 73 F.3d 616, 625 (6th Cir. 1996).

Turning to these factors, the evidence established voluntariness on the part of the Defendant. Though Defendant's age was not elicited at the hearing, he is a middle-aged individual with a thirteen-year-old daughter. He has a twelfth-grade education and is articulate.

As for Defendant's understanding of the right to refuse consent and knowledge of his constitutional rights, there is no evidence

7

that he was informed of those rights prior to consent being obtained. However, "[t]he defendant's knowledge of his right to refuse to consent is a factor, but the government need not prove that the defendant had such knowledge to establish that consent was voluntary." United States v. Erwin, 155 F.3d 818, 823 (6th Cir. 1998).

In this case there is no evidence Defendant was unaware of his rights. To the contrary, Defendant had some knowledge of his rights to refuse to consent as evidenced by his asking permission to speak with Leonard about whether he should voluntarily open the shed and later at the jail when he wrote he "was not waivering [sic] his rights" beside his signature on the Waiver of Rights form.

In addition, there is no evidence that the officers were abusive, threatening, or overbearing in dealing with the Defendant. In fact, Agent Hardcastle was candid about the purpose of his visit to Defendant's house and why he wanted to search. At the time of the request to search the property, Defendant was approached only by Agent Hardcastle and Deputy Henderson, neither of whom was in uniform or wearing raid gear, and neither of whom was carrying a weapon which was visible. When asked if Defendant would give his consent to the search, he agreed and suggested they begin with the house. Defendant then began to lead Agent Hardcastle into the house until the guns were sighted against the wall and he was asked to remain on the porch. Afterward, he hesitated for a minute or two

8

when asked if the officers could look into the locked shed, but after giving the lame excuse about his puppies in the shed and conferring with his friend Leonard, who suggested he continue to cooperate, Defendant stated he would go inside the house to get the key. Defendant returned with the key and gave it to the officers who unlocked the shed. There is no suggestion Defendant's will was overborne and the request to search was made shortly after the officers first approached the Defendant.

Based upon the totality of the circumstances, the Court finds that the clear and positive evidence shows that Defendant voluntarily consented to the search and that the consent was unequivocal. The Court also finds that the scope of the search did not exceed its authorization.

Whether the search is authorized by consent or warrant, "the scope of the search is limited by the terms of its authorization." Walter v. United States, 447 U.S. 649, 656 (1980). Because "[t]he touchstone of the Fourth Amendment is reasonableness," the "standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 250-51 (1991). "The scope of a search is generally defined by its expressed object." Id.

9

In this case, the terms of the search's authorization were simple. The officers asked permission to search Defendant's property, having formulated a suspicion that Defendant was involved in a marijuana grow operation. Defendant was informed of that suspicion and it is objectively reasonable to conclude that he would have understood the request to include not only his house, but also the outbuildings.

In any event, consent for the search of a specified residence or premises generally authorizes the search of auxiliary and outbuildings within the home's curtilage. United States v. Campbell, 256 F.3d 381, 390 (6th Cir. 2001); United States v. Bennett, 170 F.3d 632, 639 (6th Cir. 1999). Though Defendant could have easily refused to allow the search of the shed, he voluntarily retrieved the key from the house after being provided with an opportunity to discuss the situation with his friend. At no time did Defendant ever suggest the search should stop and proceed no further.

In reaching the foregoing conclusion regarding the voluntariness of the consent, this Court recognizes that Defendant later signed a Waiver of Rights on which he unequivocally noted "I am not waivering [sic] my rights." However, the Court rejects Defendant's suggestion that this shows he did not intend to consent to the search of his property, which had already taken place.

It is important to note that the form itself signed by the Defendant related solely to whether or not Defendant was willing to talk to the police. That is, the form contained written Miranda warnings. Defendant's refusal to sign the form says nothing about whether he previously had consented to the search of his property. In fact, his hand written message beside his signature that he was not waiving his rights is in keeping with his refusal to answer Agent Hardcastle's question about who was financing the marijuana growing operation. Further, the proof also shows the form was signed some five hours after the search of the property. Defendant's statement that he did not wish to waive his rights, even if the document had been a consent to search form, did not undo that which had already been done. See, United States v. Berry, 184 Fed. Appx. 470, 474 (6th Cir. 2006)(defendant's "refusal to sign the consent form is of no consequence, as a verbal consent to search is sufficient") United States v. Lattimore, 87 F.3d 647, 651 (4th Cir. 1996)(refusing to sign a consent form does not necessarily vitiate prior oral consent). Defendant never made any effort to retract his consent while the search progressed.

Although the Court finds that Defendant voluntarily consented to the search of his property, the entire issue presented by the Motion to Suppress could have been eliminated by the simple expediency of having Defendant execute a consent to search form at the time of the search.

11

### III. CONCLUSION

For the foregoing reasons, Defendant Jeffrey Stringer's "Motion to Suppress" (Docket Entry No. 19) will be denied. An appropriate Order will be entered.

                                         */s/ Robert L. Echols*
                                         ROBERT L. ECHOLS
                                         UNITED STATES DISTRICT JUDGE